UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KELLY G. M.,
o/b/o S.S.M.,

                           Plaintiff,

v.                                                        CASE NO. 6:22-cv-06370
                                                          (JGW)
COMMISSIONER OF SOCIAL SECURITY,

                           Defendant.
_____

J. Gregory Wehrman, U.S. Magistrate Judge,

## MEMORANDUM-DECISION and ORDER

The parties consented in accordance with a standing order to proceed before the undersigned. The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). The matter is presently before the Court on the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docs. 8, 11), as well as Plaintiff's Response (Doc. 12). Upon review of the administrative record and consideration of the parties' filings, Plaintiff's Motion for Judgment on Pleadings (Doc. 8) is **GRANTED**, Defendant's Motion for Judgment on the Pleadings (Doc. 11) is **DENIED**, and the decision of the Commissioner is **REMANDED**.

## I.    RELEVANT BACKGROUND

### A.    Procedural Background

On March 18, 2016, an application for supplemental security income was protectively filed by Plaintiff[1] on behalf of S.S.M., a child under age 18, with an alleged

_____

[1] Plaintiff is S.S.M.'s mother.

disability onset date of November 10, 2010.  (Tr. 74.)  S.S.M.'s disability was initially identified as a sensory processing disorder.  (*Id.*)  The application was denied initially on July 7, 2016, (Tr. 74-81), and a request for a hearing before an Administrative Law Judge (ALJ) was timely made, (Tr. 91.)  On December 3, 2018, following the hearing, the ALJ issued an unfavorable decision, finding that S.S.M. was not disabled.  (Tr. 13-33.)  The Appeals Council denied the request for review, (Tr. 1-6), and Plaintiff timely appealed to federal district court.  That court remanded the matter on February 3, 2021.  (Tr. 2559.)  Another hearing was held before ALJ Brian Kane on January 14, 2022, and he issued an unfavorable decision on May 3, 2022, (Tr. 2479-2499.)  Plaintiff timely appealed to this court.

**B.    Factual Background[2]**

S.S.M. was born on November 10, 2009, and was six years old when Plaintiff filed the application on her behalf.  At the time of the second hearing, held after remand, S.S.M. was in seventh grade.  (Tr. 2509.)  She indicated that she "kind of" enjoyed school, and although she did not have a favorite class, her worst class was math because she had a hard time learning in math.  (Tr. 2510.)  S.S.M. has a 504 plan, which she has had in place since third grade.  (Tr. 2519; *see also* Tr. 194-96; 200-02; 2716-19.)

S.S.M. has one brother, age five, and they argue a lot.  (Tr. 2512.)  S.S.M. admitted she gets on his nerves, bothers him, and causes the problems a lot.  (*Id.*)  S.S.M. further indicated that she also has problems with her mother, including that she refuses to do her chores. (Tr. 2513.) She did note that she gets along well with her teachers but said that she does not have friends at school and does not really like talking to people.  (*Id.*)  Plaintiff

---

[2] This recitation of facts primarily includes testimony from the second hearing before the ALJ.  Other facts will be developed throughout the opinion as relevant to the Court's analysis.

explained that S.S.M. does not like going out in public, and when she is around big crowds, she will shut down. (Tr. 2520.)  Plaintiff testified S.S.M. does not want to be around anyone and confirmed she does not have friends at home. (Tr. 2525.)

When asked about S.S.M.'s diagnoses, Plaintiff indicated that the doctors identified depression, anxiety, sensory issues, and Tourette's.  (Tr. 2524.)  Plaintiff testified that the doctors explained that the meltdowns S.S.M. has could be the result of S.S.M. holding everything together at school and then, when she gets home, to her safe place, she releases her emotions which results in the meltdowns. (*Id.*)  Plaintiff testified that S.S.M. continues to have meltdowns three to five days a week and described that, as she has gotten older, the meltdowns have gotten more violent, although she does not pinch or bite herself like she used to do.  (Tr. 2515, 2528.)  Plaintiff confirmed that S.S.M. does not have meltdowns at school, but she does process things differently.  (Tr. 2524.)  Plaintiff indicated that S.S.M. did not have behavioral issues at school, only that she was very quiet and did not interact much with others according to the school.  (Tr. 2525.)

The ALJ questioned whether S.S.M. should be getting more attention at school, in addition to the 504 plan, and Plaintiff responded that she thought S.S.M. needed more support but she has had difficulty getting the school to help, especially since COVID.  (Tr. 2516.)  Plaintiff testified that her grades were better since last year when she was receiving almost all Fs but noted that S.S.M. continued to have anxiety attacks, was having to be picked up early, and was missing school due to her anxiety.  (Tr. 2516-17.)  Plaintiff described that, on some days, S.S.M. would make herself physically ill in order to avoid school, causing her to miss a lot of school.  (Tr. 2520-21.)  Plaintiff indicated that S.S.M. sleeps a lot and seems to be depressed.  (Tr. 2521.)

Plaintiff also testified that she recently put S.S.M. back in therapy because S.S.M. struggled after the death of her grandmother and was experiencing suicidal ideation. (Tr. 2517-18) ("Oh, yeah, she was having suicidal thoughts and they became to a point where she was going to the school telling the teacher she wanted to kill herself. So, yeah, I had to do something.")

The ALJ asked Plaintiff about the rather insignificant restrictions assigned by the therapist from Villa of Hope, Ms. Ricklefs, and Plaintiff indicated that the therapist did not meet with S.S.M. in person nor did she ever speak to S.S.M. on the phone. (Tr. 2522.) Plaintiff emphasized that was one of the reasons why she was switching S.S.M. to another therapist. (*Id.*)

C.    **The ALJ's Decision**

Generally, in his decision, the ALJ made the following findings of fact and conclusions of law.

1.    The claimant was born on November 10, 2009. Therefore, she was a preschooler on March 18, 2016, the date [the] application was filed, and is currently a school-age child (20 C.F.R. § 416.926a(g)(2)). (Tr. 2483.)

2.    The claimant has not engaged in substantial gainful activity since March 18, 2016, the application date (20 C.F.R. §§ 416.924(b) and 416.971 *et seq.*). (Tr. 2483.)

3.    The claimant has the following severe impairments: anxiety disorder, sensory processing disorder, ankle disorder, obesity, and Tourette's syndrome (20 C.F.R. § 416.924(c)). (Tr. 2483.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924, 416.925 and 416.926). (Tr. 2483.)

5.    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 C.F.R. §§ 416.924(d) and 416.926a). (Tr. 2484.)

6.    The claimant has not been disabled, as defined in the Social Security Act, since March 18, 2016, the date the application was filed (20 C.F.R. § 416.924(a)). (Tr. 2493.)

## II.    LEGAL STANDARD

### A.    Standard of Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 496, 501 (2d Cir. 2009). "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  If the evidence is susceptible to more than one rational interpretation, the Commissioner's determination must be upheld. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).

### B.    Standard to Determine Disability

Because the claimant is a child, a particularized, three-step sequential analysis is used to determine whether he is disabled. *See* 20 C.F.R. § 416.924.  First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If so, the claimant is not disabled. At step two, the ALJ determines whether

the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act. *See* 20 CFR § 416.924(c).  If not, the analysis concludes with a finding of "not disabled." If the claimant has one or more severe impairments, the ALJ continues to step three.

At step three, the ALJ examines whether the child's impairment(s) meets, medically equals, or functionally equals the listed impairments in Appendix 1 to Subpart P of Part 404 of the Commissioner's regulations (the "Listings"). 20 C.F.R. § 416.924(d). In determining whether an impairment functionally equals the Listings, the ALJ must assess the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).  To functionally equal the Listings, the child's impairment(s) must result in "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).  A limitation is "marked" when it "interferes seriously" with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2). A limitation is "extreme" when it "interferes very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

If the child has an impairment that meets, medically equals, or functionally equals the Listings, and the impairment meets the Act's duration requirement, the child is disabled. 20 C.F.R. § 416.924(d).

### C.    Evaluating Opinion Evidence

"When assessing a child's ability in each of the six domains, an ALJ considers evidence from all settings, including school records such as grades and aptitude and achievement test scores, evidence from medical and nonmedical sources, and evidence from the child himself, in order to take into account the whole child."  *Kristina G. o/b/o M.E.G. v. Comm'r of Soc. Sec.*, 1:23-cv-00904-EAW, 2024 WL 3633355, * 3 (W.D.N.Y. Aug. 2, 2024) (internal quotation marks and citation omitted).  "Evidence from teachers or therapists 'cannot establish the existence of a medically determinable impairment,' but their opinions may be used 'to show the severity of the individual's impairment(s) and how it affects the individual's ability to function.'" *White o/b/o T.R.W. v. Berryhill*, No. 17-cv-6367P, 2019 WL 1367382, *3 (W.D.N.Y. Mar. 26, 2019) (quoting Social Security Ruling 06-03P, 2006 WL 2329939, *2 (2006)).

For claims filed before March 27, 2017, the SSA regulations provide that, unless the ALJ affords controlling weight to a treating source's medical opinion, the ALJ is required to consider and weigh all medical opinions of record, whether those opinions are from acceptable medical sources, other medical sources or non-medical sources, with consideration of the following factors for determining the appropriate weight to afford such opinions: (1) the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence in support of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the SSA's attention that tend to support or contradict the opinion. *Saxon v. Astrue*, 781 F. Supp. 2d 92, 103-04 (N.D.N.Y. 2011); *See* 20 C.F.R. § 404.1527 (c). The factors to be considered in evaluating opinions from non-treating medical sources

are the same as those for assessing treating sources, except that consideration of the treatment relationship is replaced with consideration of whether the non-treating source examined the plaintiff. *White v. Saul*, 414 F. Supp.3d 377, 383 (W.D.N.Y. 2019). So long as the ALJ's rationale is clear, however, the ALJ need not address each factor individually. *See Atwater v. Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013). Genuine conflicts in the medical evidence are for the ALJ to resolve. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

"[A]n ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Nicole A. o/b/o L.S. v. Comm'r of Soc. Sec.*, Case no. 1:22-cv-00343 (JGW), 2024 WL 3228001, *4 (W.D.N.Y. June 28, 2024)(internal citation omitted).  *See also Taneisha R. o/b/o N.D.P. v. Comm'r of Soc. Sec.*, 1:23-cv-00098, 2024 WL 1151764, *3 (W.D.N.Y. Mar. 18, 2024).  While "[a]n ALJ is not required to explicitly analyze every piece of conflicting evidence in the record…the ALJ cannot pick and choose evidence in the record that supports his conclusions."  *Nicole A. o/b/o L.S.*, 2024 WL 3228001, *4 (internal quotation marks and citation omitted).

## III.    ANALYSIS

Plaintiff argues that the ALJ failed to properly evaluate S.S.M.'s abilities with the functional domains, specifically the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself. (Doc. 8-1 at 18.)   Plaintiff contends that the ALJ erred by not evaluating S.S.M.'s impairments and functioning in light of the "whole child" and did so by not evaluating whether S.S.M. can function outside of the supportive settings in place, by selectively reading the

evidence and testimony to support his functional capacity finding, and by generally improperly evaluating the evidence.  Plaintiff also argues that the ALJ did not, as the Appeals Council directed, adequately evaluate Plaintiff's credibility on remand.  For these reasons, Plaintiff contends the ALJ's determination was not based on substantial evidence.  For the reasons set forth below, the Court agrees and finds remand is necessary.

### A.  The ALJ Erred in His Evaluation of the Evidence.

The Court finds that the ALJ erred in his evaluation of the evidence in several regards, including both medical opinion evidence and general evidence in the record.

### 1.  Medical Opinion Evidence

To begin, the Court finds that the ALJ did not adequately evaluate the medical opinion evidence in the record.  Throughout his opinion, the ALJ cited to the evaluation provided by Julia Ricklefs,[3] Exhibit 22F. (*See* Tr. 2486, 2487, 2488, 2489, 2491.)  He referenced it in all but one of the domain analyses in support of his conclusion that S.S.M. had less than a marked limitation in that domain and over other evidence that may suggest otherwise.  (*See id.*)  However, nowhere in his decision did the ALJ expressly identify what weight or persuasiveness he assigned to the opinion.  (*See* Tr. 2491.)  Nor did he evaluate the opinion or otherwise indicate which parts of the opinion he accepted or rejected.  While it seems that the ALJ gave the opinion great weight, the Court cannot presume the weight assigned or the analysis supporting the weight. *See Smith v. o/b/o D.R. v. Astrue*, No. 10-cv-00053-GTS, 2011 WL 1113779, *4 (N.D.N.Y. Jan. 20, 2011) (recognizing that the ALJ failed to state the weight afforded a medical opinion and failed

---

[3] The ALJ identifies this opinion as being completed by Monica Rickles. (See Tr. 2491.)  However, that appears to be a clerical error. (*See* Tr. 3071, 2485.)

to consider the relevant factors when evaluating the opinion and concluding the error required remand.) *See also Nicole A. o/b/o L.S.,* 2024 WL 3228001, *4 (noting that "an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.")(internal citation omitted).

Compounding this ambiguity are certain circumstances and facts surrounding Ms. Ricklef's opinion.  First, the Court cannot glean from the record the extent of any treating relationship between Ricklefs and S.S.M.  While the ALJ refers to the provider as S.S.M.'s treating therapist, the record contains only fifteen pages of records from this provider, and these records appear akin to an intake form from December 2020.  (*See* Tr. 2835-2849.) Significantly, Plaintiff testified that the provider never examined S.S.M. or even talked to her, which is why Plaintiff sought a new therapist.  (Tr. 2522.)  Thus, it is unclear whether Ricklefs was, in fact, a treating provider.

Second, the opinion itself is internally inconsistent.   It reflects a "marked impairment" in "age-appropriate social functioning" but in each of the individual functional categories, the provider checked either "none" or "mildly limited." (Tr. 3070, 3071.) Moreover, the ALJ did not acknowledge the "marked impairment" portion of the opinion, and instead only focused on the individual functions as applicable throughout his opinion. This internal inconsistency emphasizes why the ALJ's omitted analysis about and weighing of the opinion is so important to the Court's review.  Further, the provider noted within the opinion that "Client has engagement problems due to COVID-19 pandemic. Assessment is based on previous sessions/mother's report. This writer provides mental health services as a behavioral health intern." (Tr. 3072.)  In light of the limited medical

records, which were from December 2020, there is no way to evaluate whether the previous sessions are, in fact, consistent with the report's conclusions. Additionally, in light of Plaintiff's testimony, it is unclear the extent of the alleged "treating" relationship, but given these circumstances and internal inconsistencies, significant reliance on this opinion above other evidence to reach a determination cannot be said to be based on substantial evidence.

Additionally, the ALJ did not identify the weight he accorded to the opinion of mental health counselor Shunthenia Hill. (Tr. 2473.)  He acknowledged this opinion, referring to Hill as S.S.M.'s therapist, and noting that Hill advised that S.S.M.'s conditions "adversely affect[] her ability to focus," "affects her ability to form appropriate peer relationships," and that S.S.M. "used avoidance, escape and disruptive behaviors to cope with her emotions." (Tr. 2487, 2488, 2489.)  But the ALJ never advised the weight he afforded this opinion, nor did he indicate how he resolved these statements with other conflicting evidence throughout each of his domain analyses.  This was error.

### 2.  General Evidence

Additionally, the Court finds that the ALJ selectively read the evidence to support his conclusion that S.S.M. had less than a marked limitation in each of the domains. This affected each of the domain analyses to such an extent that the Court cannot find it to be harmless error or supported by substantial evidence.

First, in the ALJ's evaluation of the domain of acquiring and using information, the ALJ points to educational evidence and medical opinion evidence indicating that S.S.M. had no or few limitations in tasks relevant to this domain.  He stated:

> The claimant has a 504 plan, but is noted to be in general education classes (Exhibit 18E; Exhibit 7F, page 2). The claimant's 504 plans indicated that

she was a hard-working student (Exhibit 10E, page 1; 14E, page 1). Her 2017-2018 and 2018-2019 504 plans show that she is in regular education classes, with supplemental services such as additional time to complete assignments and tests, modified homework assignments, and preferential seating in the classroom (Exhibits 10E, 14E). Treatment notes show that the claimant needed time to process what she wanted to say and to process when asked a question (Exhibit 9F, page 4). Ms. Vargas, the claimant's first grade teacher for the 2015-2016 school year, noted that the claimant has shown proficiency and improvement in her work. She is described as a hard worker, who has made good gains academically (Exhibit 15E). In a separate assessment in May 2016, Ms. Vargas noted that in first grade the claimant's math and reading skills were at grade level and writing skills were just below grade level. Ms. Vargas found none to slight difficulty in various areas of this domain (Exhibit 5E). The claimant's teacher for the 2017-2018 school year, Ms. Huynh, reported that the claimant was able to meet grade level standards and understood the third-grade curriculum (Exhibit 17E).

The state agency medical consultant, Dr. Putcha, opined that the claimant had less than marked limitations in this area. Dr. Putcha noted almost normal findings on vision examination, normal pediatric evaluation, slight difficulties on a teacher evaluation, regular education classes in first grade, and understandable speech (Exhibit 2A). Lastly, an updated report from the claimant's therapist noted no limitations in deficiencies of concentration, persistence, or pace. No limitations in the ability to complete tasks, acquiring and using information, attending, and completing tasks, focusing, maintaining attention, and finishing activities (Exhibit 22F).

(Tr. 2486-87.)

However, although he noted several references to opinion evidence identifying S.S.M.'s slowness in completing assignments and difficulty in focusing, he seems to disregard those opinions in favor of Ms. Ricklef's opinion (which he identifies as Exhibit 22F). That is concerning for the reasons discussed above. Further, the ALJ never indicated why he favors that opinion over the other evidence or how he reconciles the conflicting evidence. *See Nicole A. o/b/o L.S.*, 2024 WL 3228001, *4. *See also Rebecca B. v. Comm'r of Soc. Sec.*, 22-cv-00631-HKS, 2025 WL 90625, *4 (W.D.N.Y. Jan. 14, 2025) (citing *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019))("An ALJ need not reconcile every conflict in the record but must set forth the crucial factors in his

determination with sufficient specificity to enable a reviewing court to decide whether the determination is supported by substantial evidence.*")*   Finally, he ignored the other evidence pertinent to this domain, including consistent records that reflect limitations caused by her conditions, such as delayed and slow processing, and even the most recent school year report cards, which include almost all F's and consistent comments that S.S.M. does not complete homework or engage in learning. (*See* Tr. 2645.)

Next, in the ALJ's evaluation of the domain of attending and completing information, he stated:

> The claimant has less than marked limitation in attending and completing tasks. There are no reports of disruptive behavior at school. Ms. Vargas, the claimant's first grade teacher for the 2015-2016 school year, noted that the claimant has struggled completing classroom tasks in the allotted time, and was a little unfocused (Exhibit 15E). In a separate assessment in May 2016, Ms. Vargas reported that the claimant had difficulty focusing on tasks at times. Ms. Vargas found mostly no difficulty in various areas of this domain but indicated some difficulty with completing assignments and working at a reasonable pace, noting that the claimant was slow and steady and overly cautious at times (Exhibit 5E).

> The claimant's 2017-2018, 504 plan indicates that she is a hard-working and cooperative student. She needs additional time to complete assignments but does not display emotional or behavioral difficulties in the school environment (Exhibit 10E, page 1). The claimant's teacher for the 2017-2018 school year, Ms. Huynh, described the claimant as having excellent and always cooperative behavior. She put good effort into her work and was motivated to do her best. Ms. Huynh noted that the claimant needed extra time to complete tasks in class, and that she worked slowly independently. Ms. Huynh did not attribute this to behavioral issues or to difficulty gasping the material (Exhibit 17E).

> The school psychologist, Dr. Piccolo, indicated in September 2018, that the claimant's sensory processing difficulties might manifest in difficulty completing academic assignments in a timely manner (Exhibit 18E). The claimant's therapist reported that the claimant's lack of ability to cope adversely affects her ability to focus (Exhibit 16F). The state agency medical consultant, Dr. Putcha, opined that the claimant had less than marked limitations in this area. Dr. Putcha noted mild to moderate difficulties on a teacher evaluation regarding working at a typical pace (Exhibit 2A). Lastly,

an updated report from the claimant's therapist noted no limitations in deficiencies of concentration, persistence, or pace. No limitations in the ability to complete tasks, acquiring and using information, attending, and completing tasks, focusing, maintaining attention, and finishing activities (Exhibit 22F).

(Tr. 2487-88.)

However, the ALJ's reference to Dr. Piccolo's opinion is incomplete.  Specifically, Dr. Piccolo recognized that S.S.M. demonstrated "significant weakness" in cognitive processing speed (3rd percentile for her age) and noted "[t]his weakness is likely related to her sensor processing difficulties as well as her anxious thought patterns and ongoing worry, which impact [S.S.M.'s] ability to think and process information in an efficient manner. Her delays in processing speed may manifest in difficulty expressing herself quickly and efficiently, difficulty with mental problem solving, and difficulty completing academic assignments in a timely manner."  (Tr. 223.)[4]  Further, Dr. Piccolo provided a subsequent psychological summary in December 2018, which referenced "increased emotional and behavioral difficulties during the school day," that S.S.M. "works at a very slow pace," that "she has fallen several lessons behind in math," and further noted results from certain testing "that meet diagnostic criterial for ADHD/Inattentive Type." (*See* Tr. 2655-56.) The report reflects that symptoms impact S.S.M.'s functioning at home and at school, notes specific areas of impact to include "rate of learning and academic growth, ability to follow multi-step directions, ability to organize tasks, ability to get started on classwork and homework, and assignment completion."  (Tr. 2656.)  This report is not referenced or weighed in the ALJ's decision.  Further, the ALJ did not cite the most recent

---

[4] Notably, the ALJ did not cite this opinion in his analysis of the acquiring information domain, even though portions of this opinion may be relevant to that domain.

504 plan, which includes an additional accommodation to assist with transitions. (Tr. 2718.)

The ALJ's analysis of the domain of interacting and relating with others is similarly troubling. There, he identifies numerous records from her early elementary years, but disregards a later medical opinion because it is inconsistent with the early educational records:

> The claimant has less than marked limitation in interacting and relating with others. Ms. Vargas, the claimant's first grade teacher for the 2015-2016 school year, noted that the claimant was steady and easy-going and has become more confident talking to others (Exhibit 15E). Ms. Vargas found no difficulty in various areas of this domain, reporting that the claimant was sweet and made many friends in class and on the bus (Exhibit 5E). The claimant's 2017-2018 504 plan indicates that she is a cooperative student. She is described as quiet and shy but friendly to everyone. She was observed in the classroom to be quietly attending to the teacher. She participated appropriately and volunteered (Exhibit 10E, page 1). The claimant's teacher for the 2017-2018 school year, Ms. Huynh, described the claimant as shy and introverted. She mostly whispered to adults and needed a great deal of prompting to vocalize a question, concern, or comment. She was well liked by her peers, but had a difficult time making friends because of her shy nature. She was very reluctant to participate in both large and small group activities and discussions, and preferred to work alone or with one peer (Exhibit 17E).
>
> The school psychologist, Dr. Piccolo, indicated in September 2018, that the claimant presented as a quiet, polite, and cooperative student who is not disruptive, but that she demonstrates symptoms of anxiety throughout the school day and across school environments. Dr. Piccolo noted that the claimant's sensory processing difficulty, anxious thought patterns and ongoing worry, as well as delays in processing speed might manifest in difficulty expressing herself quickly and efficiently (Exhibit 18E). The claimant's therapist reported that the claimant's lack of ability to cope adversely affects her ability to form appropriate peer relationships (Exhibit 16F). However, this is inconsistent with school records as discussed above. Treatment notes show that the claimant needed time to process what she wanted to say and to process when asked a question (Exhibit 9F/4). Treatment records also indicate that the claimant's mother reported her daughter was "Ms. Popular" (Exhibit 11F, page 5).

The state agency medical consultant, Dr. Putcha, opined that the claimant had no limitations in this area. Dr. Putcha noted normal teacher reports, citing no problems getting along with others, descriptions of a nice girl, and as making many friends (Exhibit 2A). Further, the claimant's therapist opined that the claimant had mild limitation interacting and relating with others and maintaining relationships (Exhibit 22F). Ms. McCoy noted in an updated record that although her daughter became nervous in crowds, she enjoyed going to the park, and expressing herself through music and art (Exhibit 19F).

(Tr. 2488.)

However, a review of contemporaneous treatment records from 2018 and later reflects that S.S.M. seems to no longer be simply shy but has retreated further socially. The records reflect that S.S.M.'s tics have had an impact on her social interactions, including staying by herself, being distracted, and not wanting to turn on her camera during zoom classes.  (Tr. 3059.)  The ALJ did not address S.S.M.'s Tourette's Syndrome impairment in this domain nor 2017 mental status examinations that reflect these social issues.  (See Tr. 1101, 1105) (noting in the interpersonal functioning: "social withdrawal, poor social skills, lack of peer support.")[5]  Further, in his statement that the medical reports are inconsistent with the school records, it appears he fails to note temporal difference— the school records are from 2016 and the medical report is from 2018, and certain events occurred between these years that could account for the differences, including the onset of S.S.M.'s tics as well as certain other developments within her treatment.

In the ALJ's analysis of the domain of moving about and manipulating objects, he addressed the tics S.S.M. experiences.  (Tr. 2489.)  Specifically, he addressed an occupational therapy note indicating treatment for tics, stating:

---

[5] Notably, the ALJ did cite these mental status examinations in another part of his opinion, without noting these social limitations.  (See Tr. 2490) (recognizing mental status examination from 2017 and characterizing them as revealing normal findings.)

> Updated occupational therapy notes indicated treatment for tics. However, the claimant reported pain 0/10 and she presented fidgety but friendly. Further, she reported no deficits completing activities of daily living (Exhibit 21F, pages 15, 17).

(*Id.*)

However, he appears to ignore the extent to which those same treatment notes reflect several ways in which the tics impact S.S.M.'s daily life as noted above.  The ALJ's statement that there are "no deficits completing activities of daily living" is not reconcilable with the substance of the treatment note primarily found on the page he does not cite. (*See* Ex. 21F, pg. 16, found on Tr. 3059) ("Tics do impact her attention; she appears to get thrown off;" "Mom states that [S.S.M.] refuses to turn on her video camera for zoom classes. There is a social awareness and she indicates that she feels embarrassed about it;" "She does not like to leave the house except to go to the corner store or near by rec center; she tends to stay to herself in these situations.")  Moreover, the ALJ cited to the 2021 OT evaluation report later in his decision and noted that her "tics resulted in difficulty performing some daily activities such as paying attention and being around others."  (Tr. 2491.)  Not only is this recitation internally consistent within the ALJ's opinion, but it also reflects his selective read of the evidence.

Further, in the ALJ's analysis of the domain of the ability to care for herself, the ALJ relied on an earlier evaluation performed by S.S.M.'s occupational therapist.  (Tr. 2489.)  He stated:

> On May 8, 2017, the claimant presented to Hannah Peck, OTR/L for an occupational therapy evaluation. The claimant played well, was easily redirected, and did well with all motor directions throughout. The claimant's mother reported difficulty getting in the shower/bathe, going to sleep at night, and some difficulty caring for her daughter's hair and eating. However, the claimant brushed her teeth, and made some improvements in

> variety and tolerance of clothing. Further, the claimant liked being outside,
> riding her bike, and roller skating (Exhibit 25E, pages 29-30).

(*Id.*)

While this analysis included the subjective reports from Plaintiff and S.S.M., he failed to consider the occupational therapist's evaluation, which provides certain objective test results, noting that S.S.M. presents with 5 out of 7 areas of differences in sensory processing skills and how each of those areas impact her daily functioning.  (Tr. 2672-73.)  He also did not include the therapist's impressions that "[S.S.M.] presents as a child with low neurological thresholds which impact her daily functional performance. She demonstrates an increased need for structure and difficulty tolerating transitions through her day. She also has poor postural."  (Tr. 2673.)  Further troubling is that the ALJ failed to identify in this domain analysis two additional, more recent occupational therapy evaluations, both of which detail the progression of the tics and provide additional evidence pertaining to S.S.M.'s sensory processing difficulties. (Tr. 2474-2477; 3058-3061.)  One characterizes these difficulties as "worsening."  (*See* Tr. 2474.) Nor does the ALJ address Plaintiff's testimony regarding S.S.M.'s meltdowns, significant emotional distress, or inability to regulate her emotions and anxiety.  *See Maria E. o/b/o J.M.A v. Comm'r of Soc. Sec.*, No. 1-20-cv-1337(WBC), 2021 WL 3861422, *3-4 (W.D.N.Y. Aug. 30, 2021) (recognizing that the domain of caring for oneself considered "how well a child maintains a healthy emotional and physical state, including how well a child satisfies her physical and emotional wants and needs in appropriate ways").

Finally, in the analysis of the health and physical well-being domain, the ALJ again discussed S.S.M.'s motor tics, stating "[t]he claimant was more recently noted to exhibit motor tics, which she has been able to control."  (Tr. 2490.)  However, that treatment note

cited stated "[w]riter praised pt for being able to control her motor tics when she is engaged in activity. PT was able to use coping skill, taking deep breaths when she needed to be distracted from her motor difficulties." (Tr. 2314.) This reflected one instance in 2018 where S.S.M. could control the tics during a therapy exercise—not an overall ability to control tics as the ALJ's statement suggests. (*See* Tr. 2490.) As such, this is not probative to S.S.M.'s overall condition. *See Carson v. Colvin*, No. 6:12-cv-6553(MAT), 2014 WL 1746056, *7 (W.D.N.Y. May 1, 2014) (concluding that "[t]he fact that Claimant was cooperative and friendly in a single, controlled, situation where she was interacting one-on-one with an authority figure is of negligible weight when compared to the oppositional and anti-social behaviors displayed by Claimant and at school.") (citations omitted).

Further, as addressed above, treatment notes in that same time frame and later reflect expanding and worsening tics. (*See* Tr. 2474-75) (a 2018 occupational therapy evaluation noting treatment for "worsening sensory processing difficulties" and reflecting "frequent Motor tics throughout today's session;" noting "[t]ics increasing in frequency.")

The ALJ also cited to mental status examinations from 2017, noting they were "relatively normal." However, he did not include that the mental examinations also reflect that the "age-appropriate speech" was "soft and slowed" (consistent with other record evidence) and that the mental examination included an "interpersonal social functioning" section that consistently reflected "social withdrawal, poor social skills, lack of peer support." (*See* Tr. 1101, 1105.) While perhaps independently not monumental facts, these elements support other portions of the record and show continued issues throughout the relevant period.

Additionally, the ALJ cited a treatment note from June 2018 noting "claimant reported things were going well in regard to behavior across the home and school setting." (Tr. 2490.)  But a treatment note within the same month reflected that S.S.M. was to transition from Zoloft to Prozac, that Plaintiff was reporting "out of control" behavior by S.S.M., and although Plaintiff indicated that the meltdowns were happening less frequently, they still did occur and sometimes resulted in S.S.M. sleeping from when she got home until the next morning. (*See* Tr. 2357.)  Additionally, S.S.M. reported that her anxiety was not doing well, that she had been feeling her heart racing often, and had been going to nurse frequently for stomachaches. (*Id.*)  Additionally, the tics were reportedly worse and expanding. (*Id.*) As such, the ALJ's cited treatment note is not indicative of S.S.M.'s conditions improving, as it suggests.

Moreover, the ALJ next indicated that physical examinations were generally within normal limits. (Tr. 2491.)  However, treatment notes from just a few months prior reflect suicidal ideation.  (*See* Tr. 3097) ("a few months ago [S.S.M.] told her mother that she wanted to commit suicide and 'cut her throat.'") These notes are not analyzed under any domain.

The ALJ further noted that "[i]n July 2021, the claimant offered no concerns or complaints." (Tr. 2491.)  However, the treatment note on which he relied also indicated that S.S.M. "did not wish to speak with [the pediatrician] today."  (Tr. 3115-16.)  Further, Plaintiff separately reported concerns regarding S.S.M.'s recent behavior including leaving home for a few days, resulting in child protective services and police involvement, and the pediatrician noted that S.S.M. barely passed seventh grade, her grandmother died, and recommended resumed counseling due to the sensory integration disorder and

anxiety diagnosis.  (*See id.*)  Again, the ALJ's statements suggest positive improvement and behavior when the record, taken as a whole, does not support such a trend.

Further, the ALJ recited the findings from a mental examination in December 2021, concluding the findings were generally normal.  (Tr. 2491.)  However, that same treatment note reflected increased anxiety symptoms, absenteeism from school, difficulty with sleep, and reported thoughts of not wanting to wake up.  (*See* Tr. 3146-54.)   The ALJ then opined that he "suspect[ed] the only reason the claimant went for a therapy session after long periods without was to generate evidence for this case."  (Tr. 2491.)  Yet the record reflects plausible life events that may have interrupted treatment, including the death of S.S.M.'s grandmother, who was hugely influential to S.S.M., and the fact that S.S.M.'s father left recently, and which revealed long-term domestic violence, of which S.S.M. was the victim and a witness.  Indeed, when asked why Plaintiff put S.S.M. back in therapy recently she responded "Oh, yeah, she was having suicidal thoughts and they became to a point where she was going to the school telling the teacher she wanted to kill herself. So, yeah, I had to do something."  (Tr. 2518-19.)

The Court is concerned that the ALJ's opinion suggests that S.S.M.'s treatment records reflect consistent improvement in her conditions, but there is a significant amount of evidence that suggests an opposite trend, or at least an ebb and flow in the severity of her conditions.   "The Second Circuit has cautioned, however, that '[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is [not disabled.]" *Dana F. o/b/o O.E.H. v. Berryhill*, No. 6:18-cv-1337, 2019

WL 7067060, *7 (N.D.N.Y. Dec. 23, 2019) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019)).  Moreover, these instances of selective reading of the record permeated the decision to such an extent that the Court cannot find that the decision is supported by substantial evidence.  As such, remand is required.[6]

### B.  The ALJ Erred in his Evaluation of Plaintiff's Credibility.

Second, the Court finds that the ALJ erred in his evaluation of Plaintiff's credibility. In his decision, the ALJ states:

> I have also considered the statements and testimony of the claimant's mother.  I accord limited weight to her testimony and reports, as she is a non-medical source opinion with a vested interest in her daughter receiving benefits (Testimony; 9E).    Furthermore, her testimony is generally inconsistent with the medical record indicating symptoms and limitations less extreme than her allegations.  As noted updated physical exams are generally within normal limits (Exhibit 23F, pages 31, 39). In July 2021, claimant offered no concerns or complaints. Her physical exam was within normal limits (Exhibit 23F, pages 43-44). In December 2021, the claimant exhibited normal eye contact, speech, affect, mood, thought process, thought content, perception, concentration, memory, cognitive functioning, judgment, impulse control, and insight (Exhibit 24F, pages 17-18). I note that the claimant has not submitted any additional opinions from teachers. Further, an updated opinion from a medical source indicated none to mild limitations at best (Exhibit 22F). The claimant's conditions apparently have not significantly changed since prior findings were made, and this is evidenced in part by this lack of new supportive opinions, and lack of any change to school programs, like adding and IEP and ending the 504 plan (Exhibits 23F-24F).

(Tr. 2492.)

First, it is unclear to the Court how physical examinations being normal could serve as a basis to discount Plaintiff's reports when the majority of those reports are related to mental health issues, nor does the ALJ elucidate his reasoning.  Further, the fact that

---

[6] In light of the need for remand, the Court will not address Plaintiff's argument that the ALJ did not adequately consider S.S.M.'s ability to function without supportive environments. This issue should be evaluated on remand.

S.S.M. did not offer complaints in July 2021 cannot serve as a basis to discount Plaintiff's testimony when S.S.M. told the provider that day that she did not want to speak with her. Additionally, the ALJ's citation to a December 2021 mental health examination ignores a PHQ score of 13 (moderate depression), reference to recent thoughts constituting suicidal ideation, and the provider's impression and formulation which reflects anxiety and depression symptoms, as well as tics. (Tr. 3145-51.)  Similarly, in light of the questions around Ms. Ricklef's report, it, too, cannot serve as a reason to discount Plaintiff's testimony.  Moreover, the Court notes other medically objective records validate Plaintiff's testimony of S.S.M.'s behavior, most prominently that S.S.M. suffers from a sensory processing disorder that causes her to bottle up the emotions of the day and then release them at the end of the day.  (*See* Tr. 2360) ("[history] of sensory processing disorder may also contribute to outbursts. Meltdowns at home may be more frequent due to patient controlling anxiety at school, then it becoming more apparent at home.")  Indeed, certain school notes also support Plaintiff's reporting, particularly in the difference in behavior Plaintiff observes at home versus at school.  (*See* Tr. 2688) ("Mrs. Vargas noted that during a Parent-Teacher conference…, [S.S.M.] accompanied her parents to school. Mrs. Vargas remarked that she saw a different personality in S.S.M. compared to the school persona. . . . S.S.M. was very animated in her parent's presence, even saucy in her interaction with her parents.")  The ALJ erred by broadly discounting Plaintiff's testimony as a whole when his reasoning focused on very limited treatment notes within the case. *See Carson*, 2014 WL 1746056, at *10 (concluding that an ALJ's reference to certain portions of testimony but otherwise failure to provide a credibility assessment on specific portions of the plaintiff's testimony which would be probative to the case was error.)

Accordingly, the Court cannot find that the ALJ's credibility determination is based on substantial evidence.

## IV.    CONCLUSION

"This Court cannot say that the evidence in the record as a whole definitively supports at least a marked limitation, but the ALJ failed to provide the requisite explanation to enable review of whether his finding in the domain was supported by substantial evidence." *Donohue o/b/o B.G. v. Comm'r of Soc. Sec.*, Case no. 18-cv-01412, 2020 WL 1530834, *6 (W.D.N.Y. Mar. 31, 2020). The Court simply cannot conclude, based on the ALJ's lack of reasoning, explanations, and analysis that the decision is based on substantial evidence. *See id.*

**ACCORDINGLY**, it is:

**ORDERED** that Plaintiff's Motion for Judgment on the Pleadings (Doc. 8) is **GRANTED**, and it is further

**ORDERED** that Defendant's Motion for Judgment on the Pleadings (Doc. 11) is **DENIED**; and it is further

**ORDERED** that this matter is **REMANDED** for further proceedings, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Decision and Order.

Dated: March 31, 2025                              J. Gregory Wehrman
Rochester, New York                              HON. J. Gregory Wehrman
                                                           United States Magistrate Judge